## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF | ) | |
| FIRE FIGHTERS, LOCAL 365, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 2:21-CV-154-PPS-APR |
| | ) | |
| CITY OF EAST CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Firefighters across the nation generally work a 24/48-hour shift, that is, they are on duty for 24 hours and then off for 48 hours. Most fire departments in the country adhere to this schedule. The City of East Chicago does not.  Instead, East Chicago requires its firefighters to work 8 hours on, then 24 hours off.  This leads to a perpetually rotating schedule which can wreak havoc on the lives of firefighters. It effects their personal lives and health, prevents a consistent sleep schedule, and makes it difficult to obtain reliable childcare. No other department in the country imposes this schedule.

Why is East Chicago an outlier? The firefighters say it is retaliation from Mayor Anthony Copeland because they exercised their First Amendment rights in their backing of a rival mayoral candidate and in their lobbying efforts with East Chicago's legislative body, the Common Council. The firefighters seek a preliminary injunction ordering the City to revert back to the 24/48 schedule. East Chicago says it is a cost saving measure.  I held a two-day hearing to get to the bottom of the issue. Because the

firefighters have established a likelihood of succeeding on their First Amendment political retaliation claim, and they will suffer irreparable harm if the schedule remains intact, a preliminary injunction will be issued.

## Background

On December 4, 2019, East Chicago Fire Chief Anthony Serna (who has since retired), acting at the direction of Mayor Copeland, issued a memorandum to his firefighters that a new schedule would be instituted. The old schedule was the standard 24 hours on, 48 hours off schedule employed by most fire departments in the country. Chief Serna did not give the East Chicago firefighters much time to prepare for the new schedule: it was set to begin within three days.  And the change was dramatic. The new plan called for an 8/24 schedule, whereby a firefighter would work an 8-hour shift followed by 24 hours off-shift. I have set out a typical 8/24 schedule below, and as can be seen, under the new schedule, firefighters must be at the firehouse literally every day of the week.

Monday – 7:30 am – 3:30 pm

Tuesday – 3:30 pm – 11:30 pm

Wednesday – 11:30 pm – 7:30 am (Thursday)

Friday – 7:30 am – 3:30 pm

Saturday – 3:30 pm – 11:30 pm

Sunday – 11:30 pm – 7:30 am (Monday)

While the firefighters have a union, they do not have a collective bargaining agreement with the City of East Chicago. After attempting to negotiate out of this schedule with East Chicago, the firefighters brought this cause of action claiming the schedule was thrust on them in retaliation for the exercise of their First Amendment rights—the union supported Mayor Anthony Copeland's opponent in an election and engaged in extensive lobbying of the Common Council. Although the case has a much larger breadth, the only thing presently before me is the firefighters' request for a preliminary injunction. And the request is a narrow one: they want their old schedule back while this case is being litigated.

East Chicago argues that there is no First Amendment violation and that the schedule was imposed for financial reasons. But at the two-day evidentiary hearing I conducted last Fall on the Union's motion, East Chicago provided only unpersuasive oral testimony from Mayor Copeland and former Fire Chief Serna as to *anticipated* cost savings from the change in schedule. I found that odd because nearly two years have gone by since the new schedule was implemented and yet no documentary evidence was adduced at the hearing showing the *actual* cost savings since the plan was implemented in 2019. [DE 56.][1]

---

[1] The lapse in time between the hearing date and this opinion was largely due to a stay so the parties' could attempt to settle the case. But after multiple meetings, they were unable to find a compromise. [DE 59, 61, 63, 64.]

-3-

## Findings of Fact

Prior to running for mayor, Copeland worked as a firefighter for 26 years for the City of East Chicago. [DE 56 at 174.] During that time, Copeland himself worked the 24/48 schedule. In 2010, Copeland decided to run for mayor. He campaigned to reduce corruption, obtain financial accountability, transparency, and increase the quality of life in East Chicago. *Id.* at 176. Copeland won the mayor's race, and after being elected he froze salaries and benefits for various city employees in an effort to get East Chicago's fiscal house in order. His efforts included freezing the firefighters' salaries and benefits such as longevity pay, grade pay, abolishing terminal leave, and eliminating the payout of leave banks for any firefighter hired after 2010. [DE 55 at 62-64; DE 56 at 51-52.]

Mayor Copeland was re-elected a couple of times, and in 2019 he faced yet another election. During the spring election season that year, the firefighters' Political Action Committee actively endorsed candidates opposing incumbent mayor Anthony Copeland. [DE 55 at 10-18.] Around this time the firefighters' union president, David Mata, spoke with then-Fire Chief Anthony Serna, and Chief Serna warned Mata not to go against Mayor Copeland: "If you go against the mayor and he wins, I don't know what he's going to do" and to not "go against the hand that feeds you." *Id.* at 58-59. Mayor Copeland defeated his opponent; but six of the Common Council members that the firefighters supported won their election. *Id.* at 59-60. Several firefighters protested at Mayor Copeland's inauguration, and Copeland found that to be "disrespectful." [DE 56 at 199.] After the election, Chief Serna instituted several new policies that transferred

-4-

union personnel and prohibited firefighters from parking or washing their personal cars at the station. [DE 55 at 35.]

In August 2019, Union President Mata began working with the Common Council, East Chicago's legislative body, to draft a salary ordinance that would return some of the benefits that had been frozen by Mayor Copeland nearly a decade earlier. [DE 55 at 61-62, 64.] Chief Serna well knew that a move was afoot by the Union to try and restore lost benefits because Union President Mata also spoke with Chief Serna about some of the issues. *Id*. At the Common Council public safety meeting in September 2019, the council read the salary ordinance, where terms were discussed, and amendments were suggested. [DE 56 at 48-49.] Although there was some confusion about the terms of the ordinance, thus necessitating another draft, the ordinance passed the public safety committee by a vote of 7-0. [DE 55 at 65; DE 56 at 48-49.]

Mayor Copeland watched the meeting on TV and saw union members at the meeting. [DE 56 at 202.]  Immediately after the meeting, Mayor Copeland and Chief Serna went on public radio and expressed opposition to the salary ordinance. [DE 55 at 68; 56 at 187; DE 28-8 at 12.]  Mayor Copeland was not pleased with the vote, and he told Chief Serna, "This is your problem. Fix it." [DE 56 at 182.] Mayor Copeland firmly believed that the new salary ordinance came from the Union's advocacy with the Common Council public safety committee.  [DE 56 at 203.]

At the October Common Council meeting, the amended salary ordinance was taken up by the Council and it passed by a 5-4 vote. [DE 28-9; DE 28-10.] The amended

ordinance included pay raises and a restoration of some benefits Mayor Copeland had frozen in 2010. [DE 28-9 at 6.] However, Mayor Copeland vetoed the salary ordinance, and the Common Council was unable to override the veto. [DE 55 at 69; 56 at 186-87.] Although the salary issue was put to bed at that point, Mayor Copeland remained concerned that the issue could rear its head again. In his testimony at the hearing, Mayor Copeland compared the issue to a "cancer" in remission; he "feared" its return. [DE 56 at 187.] Chief Serna thought the same thing. *Id.* at 105.

Sometime after the first reading of the salary ordinance, Mayor Copeland told Chief Serna to develop a new schedule for the fire department. Chief Serna did not consult any experts when he came up with his proposals. [DE 56 at 61, 128.] He proposed two work schedules to Mayor Copeland: an 8/24 schedule, where a firefighter would work eight hours and then be off 24 hours; or a 12/36 schedule, where a firefighter would work twelve hours and then be off 36 hours. [DE 56 at 61, 124-25, 128.]  Chief Serna testified that he was bound by an Indiana statute, which states, "A member may not be on duty more than twenty-four (24) consecutive hours and must be off duty at least twenty-four (24) consecutive hours out of any forty-eight (48) hour period." Ind. Code § 36-8-4-9; [DE 56 at 62.] But Chief Serna ignored another provision in the statute which requires firefighters to be off an additional 24-consecutive hours (in addition to the ones they are already off) during any 8-day period. *Id*. Chief Serna's proposed schedule did not comply with that provision.

Chief Serna claimed that both proposed schedules would comport with the East Chicago's cost-savings measures. [DE 56 at 60.] He described the savings and a spreadsheet he created with *projected* cost savings but failed to provide an accounting of any *actual* cost savings. *Id.* at 60, 146. He also never sought an analysis of whether the 8-hour schedule saved East Chicago money or discussed actual fiscal savings with the City Controller, who oversees the entirety of East Chicago's budget. *Id.* at 146.

Of these schedules, Mayor Copeland insisted on the 8/24 schedule. *Id.* at 125-26. According to Chief Serna, he had no idea the impact of a rotating 8-hour schedule would have on his firefighters; he neither researched it nor consulted any experts on the issue. *Id.* at 125, 128-129. For example, Chief Serna made no effort to determine how the new schedule might affect sleep schedules and whether firefighters would be well rested when they showed up to work. *Id*. Chief Serna admitted he came up with the idea by hopping on the internet and looking at shifts at steel mills. *Id*. at 61. This 8-hour rotating work schedule did not affect the supervisors—Assistant Chiefs, District Chiefs, and Acting District Chief positions. [DE 28-1.] It was only enforced on "all line personnel." *Id.*

Around October 28, 2019, the Union learned that East Chicago intended to change the work schedule from the traditional 24-hour schedule to the rotating 8-hour schedule. [DE 28-8 at 3.] The Union immediately suspected this was an act of retaliation for their efforts in lobbying the Common Council for renewed salary benefits. *Id.* Union

-7-

President Mata and Chief Serna met at a local Burger King to talk about the issue.
According to Chief Serna, he arranged the meeting to let Union know about the new
threatened schedule. [DE 56 at 70.] Union President Mata wore a wire at the meeting; he
didn't want anything that he may say to later be misconstrued. [DE 55 at 71.] He was
especially concerned that something might be "filtered wrong to the mayor." *Id.*

At the meeting, Chief Serna told Union President Mata the plans to move
forward with the 8/24 schedule and that it was necessary because the effect the 2019
salary ordinance could have on the budget. [Pl. Ex. 23 at 17:30.] Even though the salary
ordinance was a dead issue by then, Chief Serna told Mata that he needed to be
proactive in case a new salary ordinance came down the pike. *Id.* at 56:00.  But Chief
Serna also left little doubt as to what motivated the change in schedule: it was in
response to the firefighters' lobbying efforts. Chief Serna candidly told Mata that the "8-
hour schedule . . . (was) a reaction to the original ordinance" lobbied for by the Union.
*Id.* at 15:53-17:15. He also told Mata that the move was being made "in anticipation of
what the firefighters' union and council is gonna do." *Id*. In explaining why they were
implementing the new schedule, Chief Serna told Mata, "You showed your hand. So we
know what the hand is. So in anticipation of what's coming down the road, that's what
these moves are right now." *Id*. Chief Serna made it clear to Mata the connection
between the schedule change and the failed ordinance: "I know, everybody knows it's
the firemen who wrote that (meaning the ordinance.) What I'm saying is that original
ordinance is what fucked this all up." *Id.*

On December 2, 2019, Chief Serna and Deputy Chief Escobedo met with Union President Mata, then-Union Vice President Manuel Paredes and then-Union Secretary Mike Widemann. [DE 55 at 72; DE 55 at 73.] At the meeting, Chief Serna tried to get the Union to agree to a memorandum of understanding (MOU) whereby Mayor Copeland would give up the proposed change to an 8-hour schedule in exchange for the Union's agreement to give up its right to negotiate with the Common Council over salary issues. [DE 55 at 74.] Here's what the proposed MOU said, in part:

> The Local agrees that it will not meet with or have any discussion with any member of the East Chicago Common Council in regards to the council's pursuit of any ordinance concerning the East Chicago Fire Department.

[DE 28-8 at 6-7.]

The proposed MOU was written up by Widemann, the Union Secretary, and he is the one who sent the draft of the MOU to Union President Mata. [DE 55 at 75.] But the initial idea behind the MOU may have come from elsewhere. Widemann and Chief Serna were close friends [DE 56 at 130], and the Union believes that Widemann was carrying the water for Serna. In any event, whoever came up with the idea, Union President Mata thought the MOU was a bad idea and he told Widemann as much. [DE 55 at 78.]   Widemann became upset and screamed at him that they should just abandon their efforts with the Common Council. *Id.* Widemann tried to get others in the union to go along with his plan to sign the MOU and put the matter behind them. [DE 55 at 180.] But his attempts at persuading his fellow union members were unsuccessful, and as a

result he resigned from his position in the union. *Id*. Later that day, December 3, 2019, the firefighters' union members rejected the MOU, and Union President Mata notified Chief Serna of their decision.

The very next day, December 4, 2019, Chief Serna discontinued the 24/48 schedule.  The 24/48 schedule is the most common schedule used by fire departments in the United States. In its place, Chief Serna immediately implemented the 8/24 schedule set out above, and at the same time he suspended all shift trades. [DE 28-1; 28-2.] No other fire department in the country employs an 8/24 work schedule. [DE 55 at 268.]

The Union immediately suspected they were being retaliated against by the Mayor and Chief Serna. In response, Mayor Copeland took to Facebook to defend his actions in implementing the shift change. On December 6, 2019, he wrote that his decision to impose a new schedule on the firefighters was "not about retaliation. It's about efficiency." [DE 28-8 at 7.] Then, three days later, he wrote that the schedule change was necessitated by the union's refusal to sign the MOU. Recall that the MOU would have prohibited firefighters from lobbying the Common Council on any ordinance concerning the fire department. According to Mayor Copeland, the firefighters' refusal to sign the MOU left him "no choice but to move on with the schedule change." *Id.* at 1.

The firefighters immediately began lobbying the Common Council to revert the schedule back to a 24/48-hour shift. On December 23, 2019, the Common Council

-10-

passed Ordinance 19-0029, which set the firefighters' work schedule back to the traditional 24/48 schedule. [DE 28-11.]  In response, Mayor Copeland vetoed the Ordinance, and the Common Council overrode the veto. *Id.* Mayor Copeland then filed a lawsuit against the Common Council, alleging that the Common Council had usurped his executive powers under Indiana law by implementing the firefighters' work schedule. [DE 28-11; 36-1]; *Mayor Anthony Copeland of the City of East Chicago v. Common Council of the City of East Chicago*, 45D11-1912-MI-00103 (Lake Cty, Ind. Sup. Ct. 2019). Mayor Copeland argued that setting work schedules is an administrative function reserved to the executive branch of government. *See* Ind. Code § 36-4-4-3. The Lake County Superior Court issued an *en banc* order agreeing with Mayor Copeland that it was for the Mayor (not the Council) to "oversee the day-today administrative functions of the Fire Department" including setting work schedules.  Therefore, the court struck down Ordinance 19-0029, [DE 28-12 at 8-9], and the 8/24 schedule remained in effect.

Mayor Copeland claims that the change in schedule was made for "efficiency" and cost savings.  According to Chief Serna, the 8/24 work schedule was implemented as a way to offset the additional costs that could accrue if the 2019 salary ordinance passed.  [DE 56 at 63.] Yet, the salary ordinance didn't pass, and the schedule change was made anyway. Chief Serna testified that this was done as a prophylactic measure in case the salary ordinance was raised anew. [DE 56 at 73-75; 187.]  But other than conclusory testimony from Chief Serna [*see* DE 56 at 111], no evidence was presented at the hearing clearly

showing the savings that have been achieved by going to the 8/24 schedule in the two years since the schedule change was implemented.

The new schedule required East Chicago to separate firefighters into four "turns." Under the 24/48 schedule, there were only three turns. Consequently, the number of firefighters on each turn has been reduced. [DE 28-1; DE 55 at 104.] This problem is exacerbated by the fact that staffing levels have been greatly reduced since the implementation of the 8/24 schedule. Whereas there were 63 "line" firefighters in East Chicago prior to the change in the schedule, there are now 44. [DE 55 at 100-101.] Some of the decrease in staffing is owing to the arduous nature of the 8/24 schedule which has led to low morale and poor firefighter retention. [DE 55 at 203.]

Consistent rest is critical to efficient and effective firefighting. [DE 55 at 287.] But under the 8/24 schedule, East Chicago firefighters are exhausted when they come on duty. *Id*. at 99.  This is because there is nothing consistent about the schedule.  Under the old schedule, firefighters would start their day at either 7:30 am, 3:30 pm, or 11:30 pm.  For example, a firefighter who works the day shift starts work at 7:30 am Monday and is on duty through 7:30 am Tuesday; she's then off duty from 7:30 am Tuesday through 7:30 am Thursday. And then the cycle repeats itself. This enables consistent sleep patterns.  But under the 8/24 schedule, it rotates every day such that a firefighter might work a day shift on Monday (7:30 am to 3:30 pm), then an afternoon/night shift on Tuesday (3:30 pm

to 11:30 pm); followed by a graveyard shift on Wednesday into Thursday (11:30

pm to 7:30 am), and then the cycle repeats.

      Unsurprisingly, this perpetually rotating schedule has wreaked havoc on

the lives of the East Chicago firefighters. The new schedule has been deleterious

to their health and well-being.  Because the schedule changes each day,

firefighters cannot get on a normal sleep schedule.  Several firefighters credibly

testified that the schedule has caused them to gain weight, has led to a lack of

sleep, irritability, trouble concentrating, and prevents a consistent exercise

regime. [DE 55 at 88-97, 100-08, 204-10, 228-40, 268-87.]  There are practical

problems as well.  It is nearly impossible to get dependable childcare for

firefighters who are parents.  One firefighter testified credibly about the

"logistical nightmare" the rotating schedule poses to her. [DE 55 at 207-08.] Ever

since the new schedule has been implemented, the Assistant Fire Chief has heard

a number of serious complaints about how the schedule is making caring for

kids, elderly parents and meeting other family responsibilities nearly impossible.

[DE 55 at 269, 284.]

      David Mata, the president of the firefighters' union, has over twenty years of

experience as a firefighter. He discussed how after the new schedule was implemented,

the number of line firefighters decreased from 63 to 44 [DE 55 at 100-01.] Mata testified

that with the reduced number of firefighters, the workload increased for the remaining

firefighters and with the constant change of schedule, captains do not have a clearly

assigned team. *Id.* at 105. He testified that many firefighters are leaving, quitting, or calling off work far more than before the implementation of the 8/24 schedule. *Id.* at 106-07.  He provided a troubling example of a firefighter who is scheduled for a 7:30 am - 3:30 pm shift, and at the end of that shift is notified that if another firefighter calls off or quits, that same firefighter fills in the vacant 3:30 pm – 11:30 pm shift and is then required to show up for his regularly assigned 3:30 pm – 11:30 pm shift the very next day. *Id.* at 107-08. Essentially, this firefighter works 16 hours straight with only 16 hours off before beginning another 8-hour shift.

He discussed how prior to the schedule change, the minimum number of firefighters needed to staff the engines was 17, and then, due to staffing shortages, East Chicago removed one fire engine and now only 14 firefighters are available to man the engines. *Id.* at 101-02. He explained that firefighters were no longer allowed to trade shifts and the detrimental impact this schedule had on the firefighters' personal lives, including obtaining childcare. *Id.* at 88-89, 97. He expressed concern about the lack of regular sleep and how that can detrimentally impact a firefighters' ability to effectively perform his or her job and public safety. *Id.* at 99. He discussed how unlike the firefighters, the police schedule does not rotate the same way. *Id.* at 119. Union President Mata also testified that he has attempted on multiple occasions to speak with Mayor Copeland, attempt to collectively bargain, work with the Common Council to reverse the schedule, and mediate, all to no avail. *Id.*

I also heard from Angel Gilarski, who testified as to the effect this new schedule has had on her personally and the difficulty it has created in obtaining routine sleep and childcare. *Id.* at 204. She stated that she isn't well rested and trying to manage her child's regular routine with her irregular work schedule has had a severe and detrimental impact on her personal life and ability to work. *Id.* at 204-08. She testified that she feared repercussions and felt the need to scrutinize every decision the union made due to East Chicago's "drastic reactions" and how this has affected the way the union has been run. *Id.* at 209-10.  Specifically, she testified as to being told to "Stay out of politics. You know, what do you guys expect? What do you think is going to happen" and "If this goes through . . . they are going to close down a fire station or lay people off." *Id.* at 190.

I also heard from Manuel Peredes, who testified that he resigned from the East Chicago fire department due to the 8/24 work schedule. *Id.* at 228-29. As stated previously, Peredes was the Vice President of the Union at the time the MOU was suggested. *Id.* at 242.  During that meeting, Chief Serna stated that an MOU could be worked on to avoid the entire 8-hour schedule. *Id.* at 245. He testified that he resigned as Vice President of the Union two months later due to the detrimental impact the 8-hour rotating work schedule had on him. *Id.* at 243.  The new schedule left him sleep deprived and without a consistent sleep pattern. *Id.* at 229-33. His inability to obtain proper sleep negatively affected his job performance. *Id.* at 233. He began seeing a therapist to help with his lack of sleep and traumatic experiences on the job. *Id.* at 236.

-15-

He also discussed these issued with other firefighters and the assistant chiefs. *Id.* at 239. He then took FMLA leave and decided to leave the East Chicago fire department altogether. *Id.* at 237. He currently works for the Hobart fire department. *Id.* Peredes testified that since leaving the 8/24 schedule, his life has improved drastically. *Id.* at 240.

Lastly, as noted above, I heard from retired Assistant Chief Carlos Aburto, who testified as to his personal experience as to why the 8/24 work schedule was detrimental to the firefighters:

> The reason is that firefighters have to be wired a certain way in order to be ready. So firefighters need to be well trained, they need to be well rested, and they have to be given very little distraction. The reason for that 24-hour period is because once you come into the firehouse and you are starting your shift, everybody has roles in the fire department. Everybody knows them, and everybody is supposed to carry them out. So they have an opportunity to engage the shift, and they know that they are locked in for 24 hours, so there's no distraction.
>
> So they go about their duties. They have either breakfast or lunch together. They train together. They carry on, respond to incidents during the course of the 24 hours, and that brings together the cohesiveness of that unit. People learn their strengths -- the captains on the shift understand the -- can train with their crew, and they can attain a certain amount of knowledge as it relates to the strengths and the weaknesses of that particular crew and you can address them. So that doesn't happen on an 8-hour shift.

*Id.* at 268-69.

Aburto also testified about the practical problems the 8/24 schedule posed to the firefighters. After the schedule was implemented, he heard a number of complaints about how the schedule is making caring for kids, elderly parents

and meeting other family responsibilities nearly impossible. [DE 55 at 269, 284.] This was corroborated by the testimony of another firefighter who testified how the rotating schedule is a "logistical nightmare" making the procurement of dependable childcare nearly impossible. [DE 55 at 207-08.]

Aburto also testified that apart from proper sleep and ability to maintain consistent and routine childcare, the traditional 24/48 schedule allows the teams to build comradery and cohesiveness to streamline the effectiveness of the firefighting team. *Id.* at 269. Aburto also corroborated the testimony of Mata that, under the 8/24 schedule, the number of firefighters on shifts was reduced from 17 to 14. This meant less firefighters responding to emergencies, more time being needed for essential tasks and a concomitant decrease in firefighter safety. *Id.* at 273-74. In his view, there was no benefit from an operational point of view to having an 8/24 work schedule. *Id.* at 287.

## Discussion

The firefighters' request for a preliminary injunction is somewhat limited when compared to the breadth of the case as a whole: they only seek an injunction that the previous work schedule be reinstated while this case is being litigated. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must demonstrate a likelihood of success on the merits, that an irreparable harm will result without an injunction, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id.* at 20; *see Higher Soc'y of Ind. v. Tippecanoe Cty.*,

-17-

858 F.3d 1113, 1116 (7th Cir. 2017); *Leone v. Comm'r, Ind. BMV*, 933 N.E.2d 1244, 1248

(Ind. 2010). "The purpose of preliminary injunctive relief is 'to minimize the hardship to

the parties pending the ultimate resolution of the lawsuit.'" *Platinum Home Mortg. Corp.*

*v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (citing *Faheem-El v. Klincar*,

841 F.2d 721, 727 (7th Cir. 1988)).

> 1.    **Likelihood of Success on the Merits**

The first issue is whether the firefighters are likely to succeed on the merits of

their First Amendment retaliation claim. The First Amendment protects freedom of

speech "to assure [the] unfettered interchange of ideas for bringing about of political

and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957);

*Buckley v. Valeo*, 424 U.S. 1, 14 (1976).  And "in First Amendment cases, the likelihood of

success on the merits will often be the determinative factor . . . because even short

deprivations of First Amendment rights constitute irreparable harm, and the balance of

harms normally favors granting preliminary injunctive relief because the public interest

is not harmed by [the preliminary injunction]." *Higher Soc'y of Ind.*, 858 F.3d at 1116

(internal citations and quotations omitted); *see Korte v. Sebelius*, 735 F.3d 654, 666 (7th

Cir. 2013) ("the analysis begins and ends with the likelihood of success on the merits of

the [First Amendment] claims.").

The government may not take an adverse employment action against an

employee in retaliation for exercising his or her First Amendment right to free speech.

*Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To succeed on the merits of this claim, the

-18-

firefighters must show that they engaged in "constitutionally protected" conduct, "that the protected conduct was a motivating factor in the employer's actions," and that they suffered "a deprivation likely to deter free speech." *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019). Once the firefighters establish their speech was at least a motivating factor of East Chicago's decision to retaliate, "the burden shifts to [East Chicago] to rebut this causal inference raised by the [firefighters'] evidence." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). "If [East Chicago] fails to counter the [firefighters'] evidence, then [East Chicago's] retaliatory actions are considered a 'necessary condition' of the [firefighters'] harm, and the [firefighters have] established the but-for causation needed to succeed on [their] claim." *Id.* (citing *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011)).

The firefighters claim that East Chicago violated their First Amendment rights by taking an adverse action against them—the imposition of the 8/24 schedule. The firefighters allege the retaliation was in response to three protected First Amendment activities: the firefighters' support of the Mayor's opponents during the election; the firefighters' communications with the Common Council to lift the freeze on salary and benefits from 2010; and the firefighters' association with a union while it engaged in political activity. At this stage, I need only consider the firefighters' strongest argument: that East Chicago retaliated against them for their communications with the Common Council.

East Chicago argues that there is no First Amendment violation here because the firefighters' discussions with the Common Council and the salary ordinance only involved private interests that do not concern the public and that the 8/24 schedule was imposed only for financial reasons. [DE 36 at 15.] It argues that because there is no First Amendment violation, there cannot be a likelihood of success on the merits.

While it is true that "not every utterance by a public employee" is entitled to First Amendment protection, the firefighters' attempt to negotiate relief from nine years of frozen benefits and wages with the Common Council is plainly protected First Amendment activity. *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994). Back when Mayor Copeland was elected in 2010, many East Chicago employees' salaries and benefits were frozen as the new administration attempted to balance the books. However, after nine years of stagnant salaries and frozen benefits—including terminal leave, longevity pay, grade pay, payouts, and other benefits—the firefighters were well within their First Amendment rights to lobby the Common Council to get some of these benefits back, or at the very least re-considered.

The fact that the firefighters stood to personally benefit from their lobbying efforts is not determinative on the issue of whether they were speaking on a matter of public concern.  Just because "'an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern.'" *Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006) (quoting *Button v. Kibby Brown*, 146 F.3d 526, 529 (7th Cir. 1998). This is especially true when public safety is in issue.

-20-

"Matters of police protection and public safety are generally topics of public concern." *Miller v. Jones*, 444 F.3d 929, 935 (7th Cir. 2006). Firefighters provide a public service to the citizens of East Chicago and discussing the salaries and benefits of public employees, especially firefighters and police who put their lives on the line to protect the citizens of their municipality, is a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006); *see also Moore v. Kilgore*, 877 F.2d 364, 371 (5th Cir. 1989) ("The operation of the city Fire Department certainly is a matter that concerns interested citizens.").

The amount of funds allotted to firefighters' salaries and benefits directly relate to public safety because it determines the number of firefighters the municipality can hire and whether each fire station can be fully staffed. It also speaks to the attractiveness of the position and whether well-trained and experienced firefighters would choose this municipality over another. *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995) ("Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services."). Retired Assistant Chief Aburto testified that East Chicago's salary and benefits are in the bottom 50% of the region. [DE 56 at 22.] This cannot be surprising considering the salary and benefits have been frozen for over nine years and some benefits are not afforded to any new hires. [DE 55 at 62-64; DE 56 at 51-52.]

Additionally, the firefighters, as a class, are well informed to advocate on how best to allocate spending in the fire department and should not fear retaliation for

-21-

lobbying the Common Council for such proposed measures. *See Pickering v. Board of Educ.*, 391 U.S. 563, 571-72 (1968) (discussing a similar situation where teachers, as a class, are most likely to have informed opinions on how funds allotted to the school system should be spent and it is essential that they be able to speak freely on such questions without fear of retaliation).

Both Union President Mata and retired Assistant Chief Aburto discussed staffing shortages during the preliminary injunction hearing. [DE 55 at 101-02, 272-73.] The new schedule required East Chicago to separate firefighters into four "turns." Under the 24/48 schedule, there were only three turns.  Consequently, the number of firefighters on each turn has been reduced. [DE 28-1; DE 55 at 104.] What's more, since the schedule change, there has been a serious decrease in the number of firefighters (from 63 to 44 line firefighters), at least in part due to the 8/24 schedule. *Id.* at 100-02, 203, 272-73. Prior to the 8/24 schedule, the East Chicago fire department was able to operate four engines with 17 firefighters. *Id.* In order to deal with the staffing shortages, the fire department took one engine out of commission so that only 14 firefighters were needed on a shift. Retired Assistant Chief Aburto testified that less firefighters available means more time needed to respond to an emergency, which is detrimental to the safety of both the citizens and the firefighters. *Id.*  at 273-74.

Finally, what makes it even more obvious that this is a matter of public concern is the involvement of the Mayor and Common Council in the issue. After the Common Council presented the salary ordinance and amendments were considered and made,

the amended salary ordinance was passed by the Common Council and the Mayor vetoed the amended salary ordinance. Mayor Copeland, along with Chief Serna, went on public radio to again express distaste for the salary ordinance. [DE 28-8 at 12.] Mayor Copeland also posted his opposition on Facebook in October. [DE 28-8 at 10.]

The matter was so important that Mayor Copeland also opposed the Common Council's interference with his ability to set the firefighters' work schedule when it passed and overrode the Mayor's veto to revert the schedule back to a 24/48 schedule. Mayor Copeland sued the Common Council and the firefighters tried to intervene in that lawsuit. *Mayor Anthony Copeland of the City of East Chicago v. Common Council of the City of East Chicago*, 45D11-1912-MI-00103 (Lake Cty, Ind. Sup. Ct. 2019). However, the Lake County Superior Court sided with Mayor Copeland and found that the firefighters' work schedule fell within his authority as the executive of East Chicago. [DE 28-12.]

In sum, it is beyond question that the salary ordinance and the firefighters' work schedule are matters of public concern. And when the firefighters in this case lobbied the Common Council on those issues, they were therefore engaging in protected First Amendment activity.

The next issue is whether the firefighters' lobbying of the Common Council was the motivating factor for the adverse action taken against them—the imposition of the 8/24 schedule. *Daza*, 941 F.3d at 308. It surely was. I need to look no further than the words of Chief Serna and Mayor Copeland to prove the point. Recall that Chief Serna

-23-

explicitly said to Union President Mata at their Burger King meeting that the "8-hour schedule . . . (was) a reaction to the original ordinance" lobbied for by the Union. [Pl. Ex 23 at 15:53-17:15.] He also told Union President Mata that the move was being made "in anticipation of what the firefighters' union and council is gonna do." *Id*. Speaking of the ordinance, and where it came from, Chief Serna told Mata, "I know, everybody knows it's the firemen who wrote that (meaning the ordinance.) What I'm saying is that original ordinance is what fucked this all up." *Id.* In explaining why they were implementing the new schedule, Chief Serna told Mata it was payback time: "You showed your hand (meaning lobbying for the ordinance). So we know what the hand is. So in anticipation of what's coming down the road, that's what these moves are right now." *Id*.

Mayor Copeland likewise conceded the causation point. He told the public in a Facebook post shortly after the 8/24 schedule was implemented that it was necessitated by the union's refusal to sign the MOU—an MOU which specifically would have prevented the firefighters from lobbying the Common Council. [DE 28-8 at 2.] According to Mayor Copeland, the firefighter's refusal to give up their First Amendment rights by agreeing to refrain from lobbying the Common Council left him "no choice but to move on with the schedule change." *Id.* There can be no doubt, therefore, that the firefighters lobbying efforts with the Common Council was the motivating factor in the adverse action—the implementation of the 8/24 schedule.

The final issue in determining the likelihood of the firefighters succeeding on the merits is whether the defendants' conduct will likely deter free speech. *Daza*, 941 F.3d at 308. In my view, the imposition of the 8/24 schedule in and of itself is likely to do just that. Indeed, nearly two decades ago, the Seventh Circuit held the same thing under similar circumstances. *See Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) (holding that an "unfavorable change in schedule" was an adverse action sufficient to deter the exercise of free speech). More importantly, credible evidence at the hearing proves the point. Ms. Gilarski was one of the firefighters who was greatly affected by the change in schedule. She persuasively testified that ever since the new schedule was thrust upon her, she has been very reluctant to speak out for fear of what might come next. She testified credibly that the firefighters have refrained from speaking up "about certain issues" since the 8/24 schedule was implemented. [DE 55 at 209.] Instead, when any important issue comes up, the firefighters must calibrate whether commenting on it is "worth it" for fear that if they do, a "drastic reaction" from East Chicago could ensue. *Id.* at 209-10. It is therefore clear that the firefighters are being deterred in the exercise of their First Amendment rights.

In sum, considering all the evidence presented during the preliminary injunction and post-hearing briefs, I find that the firefighters have made a strong showing of likelihood of success on the merits. They engaged in protected First Amendment activity, that activity was a motivating factor in East Chicago's imposition of the 8/24 work schedule, and they suffered a deprivation likely to deter free speech.

2.      **Irreparable Harm**

Irreparable harm is easily met in the First Amendment context.  That's because "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). As noted above, the reason for this brightline rule was made clear in this case through the testimony of the current union secretary, Ms. Gilarski, who specifically (and credibly) testified just how afraid she is to speak her mind for fear that another onerous policy will come thundering down on her head.

What's more, there are other irreparable harms in this case entirely outside of the chilling of First Amendment rights. The 8/24 schedule itself is causing irreparable harm.  As discussed above in my findings of fact, many firefighters testified credibly at the hearing on the deleterious effect the schedule has had on them. [DE 55 at 88-97, 100-08, 204-10, 228-40, 268-87.]  It seems rather obvious if one has a perpetually rotating schedule, it will wreak havoc on one's sleep, can cause weight gain, trouble concentrating, and irritability, never mind the obtaining of reliable childcare or care for an elderly loved one. In sum, irreparable harm is readily shown here.

3.      **Balancing Harms**

Finally, before issuing an injunction I must balance the harms to both parties. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his

favor." *Turnell v. CentiMark Corp.,* 796 F.3d 656, 662 (7th Cir. 2015). This isn't some kind

of math problem. Instead, "it is more properly characterized as subjective and intuitive,

one which permits district courts to weigh the competing considerations and mold

appropriate relief." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th

Cir. 2012) (citation and internal quotation marks omitted).

On the record before me, the balance of harms in this case is a complete

mismatch. For starters, on this record, the firefighters have a high likelihood of success

on the merits. But even if the merits question was a coin flip, there is no doubt that the

harm to the firefighters greatly outweighs any alleged financial harm to East Chicago.

On the other hand, if I don't grant the injunction, the firefighters will have their First

Amendment rights impeded upon and they will be forced to continue the 8/24 work

schedule which has potentially long-term consequences. This schedule is not used

anywhere else in the country. And with good reason. As discussed above, it is causing

severe problems for the East Chicago firefighters' sleep schedules, personal lives, and

ability to find routine childcare. On the other hand, I heard no testimony other than

conclusory statements from Chief Serna of the "cost savings" from the 8/24 schedule.

Neither Mayor Copeland nor Chief Serna provided any documentation that supported

the financial benefit to this schedule. Neither of them considered obtaining a financial

analysis of the fiscal benefit or whether any actual money had been saved in East

Chicago's budget. *Id.* at 146. When compared with the undocumented possibility that

East Chicago might be saving money, the weighing in this case is an anvil versus a feather. Therefore, the balance of harms overwhelmingly favors the firefighters.

One final point: East Chicago makes much of the fact that the firefighters waited nearly two years to bring this request for a preliminary injunction, and that is somehow proof that there is no irreparable harm. But I hardly think the firefighters can be criticized for first trying to negotiate their way out of this onerous schedule before resorting to the courts for relief. During the time between the implementation of the schedule and the filing of this lawsuit, the Union tried to get the Common Council to solve the problem, but that ran headlong into the state court litigation described above. Then, extensive efforts were made to negotiate with the Mayor to get him to change the schedule back. All to no avail. Only then did the Union turn their efforts from negotiation to litigation. That is no reason to deny a preliminary injunction.

In sum, the firefighters have met all requirements for the issuance of a preliminary injunction. They engaged in constitutionally protected First Amendment conduct about a matter of public concern, and they were punished as a result. Irreparable harm will be suffered by the firefighters if this injunction is not issued in the form of further loss of their First Amendment rights and their continuing to be saddled with a work schedule that quite literally makes no sense and is deleterious to their health and well being. I will therefore GRANT the preliminary injunction and order the reinstatement of the 24/48 work schedule for the pendency of this litigation.

-28-

Conclusion

Accordingly, for the reasons detailed above, Plaintiffs' Motion for Preliminary Injunction [DE 26] is **GRANTED**.

It is therefore **ORDERED** that the City of East Chicago immediately begin the process of reinstating the 24/48 schedule for its firefighters. Because it may take a few weeks to fully implement the new schedule, East Chicago will have until April 18, 2022, to have the schedule in place.

Finally, on March 18, 2022, the Plaintiffs filed a "Notice of Additional Facts" supporting their request for a preliminary injunction, which Defendants moved to strike. [DE 72, 73.] I have not relied on anything in the Plaintiffs' recent filing in my disposition of the present motion. The Defendants' Motion to Strike [DE 73] is therefore GRANTED.

**SO ORDERED.**

Entered: March 28, 2022.

/s/ Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT